FILED
U.S. DISTRICT COURT
DISTRICT CF MARYLAND

2015 DEC 22 PM 7: 27

CLERK'S OFFICE
AT BALTIMORE

BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | |
| *Plaintiff*, | |
| v. | Civil Action No. ELH-15-2401 |
| COLONIAL TIDEWATER REALTY INCOME PARTNERS, LLC, *et al.* | |
| *Defendants*. | |

## MEMORANDUM

This Memorandum addresses a dispute between a court-appointed receiver and a bank that has a secured interest in property that the receiver seeks to sell to a third party. In particular, the bank insists that it is entitled to default rate interest and attorney's fees, in addition to unpaid principal and interest due and owing under its loan agreement with the property owner.

On November 18, 2015, Marion A. Hecht, Receiver, filed "Motion Of Receiver To Authorize Sale Of Country Living Mobile Home Park." ECF 20, "First Motion." Then, on November 25, 2015, the Receiver filed "Motion Of Receiver To Approve Sale Of Country Living Mobile Home Park to Cathy and Tim Driebelbies." ECF 21, "Second Motion." Pursuant to both ECF 20 and ECF 21, the Receiver seeks authorization from this Court to sell real property and a business commonly known as "Country Living Mobile Home Park," located on Stony Fork Road in Tioga, Pennsylvania (the "Property"). Stony Fork Associates, LLC ("Stony Fork"), a Maryland limited liability company, is the title owner of Country Living Mobile Home Park, which is Stony Fork's primary asset. Northwest Savings Bank (the "Bank" or "Northwest") is a secured creditor of Stony Fork.

After the Receiver filed the First Motion, she entered into a Contract For Sale Of Real Property ("Contract"). Specifically, on November 20, 2015, the Receiver, as Seller, and Cathy and Tim Driebelbies, as Purchaser, executed the Contract, by which the Purchaser agreed to buy the Property. *See* ECF 21 at 18-30 (Contract and Attachments). Under the terms of the Contract, the Purchaser has agreed to pay the Seller $390,000 for the Property, with closing to take place within 20 days of Court approval. ECF 21 at 3. No real estate commission is due upon the sale. *Id.* The Receiver represents that, "in her business judgment," the "sale of the Property pursuant to the Contract is in the best interest of the Receivership Estate." ECF 21 at 4. As a result, the Receiver filed the Second Motion, seeking Court approval of the Contract.

Northwest has filed a "Memorandum Of Limited Opposition To (I) Motion Of Receiver To Authorize Sale Of Country Living Mobile Home Park And (II) Motion Of Receiver To Approve Sale Of Country Living Mobile Home Park To Cathy And Tim Driebelbies And Request For Hearing." *See* ECF 22, "Opposition." The Opposition is supported by several exhibits. *See* ECF 22-1 to ECF 22-5.

In its Opposition, the Bank contends that both motions "impermissibly interfere" with its "contractual and property rights arising out of a commercial loan to Stony Fork," because the motions would allow the Receiver "to sell certain income producing property of Stony Fork which is collateral for the loan," without paying the Bank "the full amounts of the indebtedness secured by the [P]roperty." ECF 22 at 1. The Bank insists that, in addition to its entitlement to the loan pay off of principal and interest, it is also entitled to recover default rate interest and attorney's fees incurred in connection with the sale. The Receiver disagrees and has replied. ECF 25, "Reply."

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons stated below, I shall grant the motions, as modified.

## I.      Factual Background

The Securities and Exchange Commission ("SEC") filed a Complaint on August 13, 2015, against defendants Colonial Tidewater Realty Income Partners, LLC ("Colonial"); James R. Glover; and Sherman T. Hill.   ECF 1.   The SEC alleged, *inter alia*, that, between 1998 and 2012, defendants engaged in "a fraudulent offering scheme and investment advisory fraud." *Id.* at 2.   According to the SEC, Colonial is a holding company that "primarily invests in and manages various forms of residential and commercial real estate, including mobile home parks . . . ."  ECF 1 at 2.   Hill "managed the day-to-day operations of business," while Glover solicited investors in Colonial, which was controlled by Hill and Glover. *Id.*  The SEC alleged that, during the scheme, approximately 125 investors were defrauded out of about $13.5 million dollars. *Id.*

Also on August 13, 2015, each defendant filed a pleading titled "Consent Of Defendant" (ECF 7, Colonial; ECF 8, Glover; ECF 9, Hill), by which each agreed, among other things, to the appointment of a receiver "to oversee" the defendants' interest in all entities subject to their control or ownership, including, among others, Stony Fork.   ECF 7, 8, and 9 at 3, ¶ 5.   In addition, they relinquished control of any interest in and any claim "to any and all assets, properties and/or interests" that they owned, controlled, or held. *Id.*  Final judgments were entered against each defendant on August 20, 2015, in varying sums of money. *See* ECF 12 (Colonial); ECF 13 (Glover); ECF 14 (Hill).

On August 13, 2015, the SEC also filed a "Motion To Establish A Receivership Estate And to Appoint A Receiver."   ECF 10.   That motion was subsequently revised. *See* ECF 15.   On

3

August 26, 2015, with the consent of each defendant, the Court entered "Order Establishing Receivership Estate And Appointing A Receiver." ECF 16, "Appointment Order." Pursuant to the Appointment Order, the Court appointed Marion A. Hecht as Receiver.

The Appointment Order is twenty-two pages in length and not readily summarized. But, it expressly confers broad powers on the Receiver "to assume control of, marshal, pursue, and preserve the Receivership Assets, and to oversee an orderly liquidation of the Receivership Assets." *Id.* ¶ 2. In addition, the Appointment Order freezes all Receivership Assets until further order of this Court. *Id.* ¶ 3. And, it enjoins interference with the Receiver's efforts to manage Receivership Assets and bars obstruction of the Receiver's performance of duties. *Id.* ¶¶ 26-28. Except with leave of Court, the Appointment Order prohibits any action against the Receivership Estate or the Receiver. *Id.* ¶¶ 29-31.

The Receivership Assets, which comprise the Receivership Estate, are defined in the Appointment Order as follows: "[A]ll assets of defendant Colonial Tidewater, including assets that: (a) are attributable to funds derived from investors or clients of the defendant; (b) are held in constructive trust for defendant Colonial Tidewater; (c) were fraudulently transferred by defendant Colonial Tidewater; and/or (d) may otherwise be includable as assets of the estate of defendant Colonial Tidewater (collectively the 'Receivership Assets' or 'Receivership Estate')." ECF 16 at 1-2.

The Receiver and the Bank disagree as to whether Stony Fork is part of the Receivership Estate.[1]  Claiming that Stony Fork is an asset of the Receivership Estate, Hecht points to the Appointment Order entered on August 26, 2015 (ECF 16), which established the Receivership

---

[1] The Receiver asserts that this Court has jurisdiction over the Stony Fork assets in Pennsylvania "because the Receiver timely made filings in accordance with 28 U.S.C. § 754. *See SEC v. Colonial Tidewater Realty Income Partners, LLC*, No. 3-15-mc-00417-UN (M.D. Pa.)." ECF 20 at 2, ¶ 4.

over all assets of Colonial, as more particularly described.  She notes that Hill and Glover agreed to relinquish various positions of control associated with Colonial when the SEC initiated the case *sub judice* (ECF 25 at 1), and Colonial holds a 50% managing membership interest in Stony Fork.  ECF 20 at 2, ¶ 3; ECF 21 at 2, ¶ 3; ECF 22 at 4, ¶ 12; ECF 25 at 2.[2]  The Bank maintains that Stony Fork is not part of the Receivership Estate.

By Deed dated November 21, 2002, Country Living Mobile Home Park, Inc., a Pennsylvania business corporation, conveyed a tract of land, with improvements, to Stony Fork, for the sum of $409,000.  ECF 21 at 13-17; ECF 28.  It is undisputed that Northwest is a secured creditor of Stony Fork, the title owner of the "Country Living Mobile Home Park."

Years later, on August 30, 2010, Northwest made a commercial loan (the "Loan") to Stony Fork in the principal amount of $350,000.  The Loan is evidenced, *inter alia*, by a Promissory Note (the "Note") in favor of Northwest, also dated August 30, 2010, in the amount of $350,000.  The Note was signed by Hill and Glover as managing members of Colonial.  ECF 22-1.

The Property is "encumbered by a first position lien and security interest in favor of Northwest," pursuant to a Purchase Money Mortgage dated August 30, 2010, from Stony Fork to Northwest (the "Mortgage"), recorded with the Tioga County Recorder of Deeds.  ECF 21 at 4, ¶ 9; *see also* ECF 22-3 (Mortgage).  Pursuant to the Mortgage, Stony Fork conveyed to Northwest all of Stony Fork's right, title, and interest in certain real property and improvements, known as 19 Stony Fork Road, Tioga, Pennsylvania (*i.e.*, the Property).  *See* ECF 22-3.

---

[2] Yellow Rose Apartments, Inc. ("Yellow Rose") holds the remaining 50% interest in Stony Fork.  *See* ECF 21, ¶ 3(a); ECF 21 at 2 n.2; ECF 22 at 4, ¶ 12.  Yellow Rose may be an asset in the federal equity receivership in *S.E.C. v. Management Solutions, Inc.*, No. 2:11 VC 01165 (D. Utah).

In addition, on August 30, 2010, Stony Fork executed an Assignment of Rents in favor of Northwest, which is recorded with the Tioga County Recorder of Deeds. The Assignment of Rents granted a continuing security interest to Northwest in all of Stony Fork's right, title, and interest to present and future leases, rents, revenue, and the like from the Property. *See* ECF 22-4. And, Northwest and Stony Fork executed a Business Loan Agreement, also dated August 30, 2010 (the "Business Agreement"). ECF 22-2.

The Note provides that it is "governed by federal law applicable to Lenders, and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania . . . ." ECF 22-1 at 3. In addition, it states, *id.*: "Lender may hire or pay someone else to help collect this Note if Borrower does not pay. . . . This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses . . . ." The Note also provides for an increase in the interest rate in the event of a default. ECF 22-1 at 2. It states, in part, ECF 22-1 at 2:

> **INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding a 3.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. . . .

The Mortgage defines events of default. *See* ECF 22-3 at 9. These include failure "to make any payment when due under the indebtedness." *Id.* In addition, the Mortgage states, in part, ECF 22-3 at 10:

> **Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of the Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand . . . .

The Business Loan Agreement states, in part, ECF 22-2 at 6:

**Indemnification of Lender.**  Borrower agrees to indemnify, to defend and to save and hold Lender harmless from any and all claims, suits, obligations, damages, losses, costs and expenses (including, without limitation, Lender's reasonable attorneys' fees), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by Lender, its officers, directors, employees, and agents arising out of, relating to, or in any manner occasioned by this Agreement and the exercise of the rights and . . . (3) any failure of Borrower to perform any of its obligations hereunder . . . .

According to Northwest, it provided the Receiver with copies of all of these documents. And, it asserts that these documents establish that Northwest is Stony Fork's only lien holder, and that it has a perfected security interest. *See* ECF 22 at 3 n.2.  The Bank's status was never contested by the Receiver, however.

The Bank claims that, on or about March 30, 2015, Stony Fork defaulted on the Loan when Hill, a guarantor of the Loan, filed a Voluntary Petition under Chapter 11 of the United States Bankruptcy Code.  Further, Northwest claims that Stony Fork committed other defaults, such as requiring the appointment of the Receiver on August 26, 2015 (ECF 16). *See* ECF 22 at 5, ¶ 13.

Upon her appointment, the Receiver took control of Stony Fork's assets, *i.e.*, the mobile home park as well as Stony Fork's account at Northwest, which held approximately $6,000 at the time of the Receiver's appointment. *See* ECF 20, ¶ 9.  The Receiver did not use the funds in the bank account to make the monthly mortgage payments owed to the Bank.  According to the Receiver, it "was prudent to hold [the Bank account money] in reserve for unforeseen capital expenses as well as operating expenses" of Stony Fork. *Id.*  And, the Receiver claims she had no other source of funds if any were needed. *See* ECF 22-5 at 19.  The bank account has since grown to at least $17,000. ECF 20, ¶ 9.

7

The Receiver has represented that she promptly communicated notice of her appointment to Northwest, provided Northwest with a copy of the Appointment Order, and communicated her plans to sell the mobile home park in Pennsylvania. ECF 20 at 2. And, Northwest concedes that the Receiver contacted Northwest regarding the Loan after her appointment as Receiver. Moreover, Northwest has submitted many email communications dated between October and November 2015, involving Bank employees, the Bank's lawyer, and the Receiver, evidencing their numerous communications about the Loan and the proposed sale of the Property. *See* ECF 22-5 at 1-22. The various email exchanges address several issues. These include, *inter alia*, the Bank's request for payment of its legal fees; whether Stony Fork's assets are part of the Receivership Estate; whether the Receiver is entitled to sell the Property and obtain a release of Northwest's lien; whether the Receiver is entitled to use rent from the Property (Northwest's collateral) to make payments on the Loan; and a proposed forbearance on the Loan by Northwest to allow the Receiver time to sell the Property. *See* ECF 22 at 5, ¶ 14 (summarizing emails). Ultimately, Northwest declined to grant a forbearance to the Receiver for the mortgage payments pending the Receiver's request for court approval of the sale of Stony Fork. ECF 20, ¶ 9; *see also* ECF 22, ¶ 28.

The exhibits reflect that the Receiver initiated contact with the Bank at least by September 30, 2015. ECF 22-5 at 4. In an email at 2:56 p.m. on October 9, 2015, the Receiver wrote to Kim Miller, apparently a Bank employee, advising that she was "working a potentially good offer . . ." for the Property. ECF 22-5 at 3. In addition, Ms. Hecht stated: "Please let your bank know that I am working diligently on this asset since my appointment, which has also been communicated to a counsel your bank retained. I do not expect to pay attorneys [sic] fees, but

expect to pay the principal and interest subject to court approval.  It would be helpful to receive a

pay off statement with principal and interest only please."  *Id.*

At 3:15 p.m. on the same date, October 9, 2015, the Receiver again asked the Bank for a

"pay off statement" with a "per diem."  ECF 22-5 at 2.  In that email, Ms. Hecht stated that she

"will not recommend . . . that the Receivership Estate pay attorney fees, so if they are included,

please remove them from the pay off statement."  *Id.*

Minutes later, the Bank's lawyer emailed the Receiver.  ECF 22-5 at 2.  Counsel for

Northwest told the Receiver that "all communications [with the Bank] are to run through [him]."

*Id.*  He added: "I hope I do not have to bring this to your attention again."  *Id.*[3]

The Bank's attorney wrote to the Receiver at 5:36 p.m. on October 9, 2015 (ECF 22-5 at

10), outlining the Loan and asserting that Stony Fork and the Rent are not part of the

Receivership Estate.  *Id.*  The Bank's lawyer also stated, *id.* at 11 (emphasis in original):

> Northwest is not necessarily opposed to such a sale [of the Property] *provided* we
> have an agreement in place as to the mechanics of such a sale including, service
> of the debt pending a sale and recognition of Northwest's lien (including,
> Northwest's right to the proceeds of the sale after customary cost of sale).
>
> Given that the rent roll indicates that there is sufficient cash to service the debt
> and the fact that the Property is not part of the Receivership Estate or a
> Receivership Asset, I trust that we can reach an agreement that is mutually
> beneficial to the Receiver and Northwest.  As mentioned, this is a non-performing
> loan that is in default and Northwest requires certain minimum adequate
> assurances relating to any sale of the Property.
>
> Please let me know if you are interested in pursuing such an arrangement.  In
> connection therewith, please send me a copy of the current rent roll and details on
> the proposed sale when you have obtained internal approval.

---

[3] The Receiver is not a lawyer.  Therefore, she was not barred from communicating
directly with the Bank.  ECF 25 at 4; ECF 22-5 at 21.  *See generally* MARYLAND RULES OF
PROFESSIONAL CONDUCT ("MRPC") 4.2(a) ("[A] *lawyer* shall not communicate about the subject
of the representation with a person who the *lawyer* knows is represented in the matter by another
lawyer . . . .") (emphasis added).

Hecht responded to the Bank's lawyer at 3:00 p.m. on October 13, 2015. ECF 22-5 at 9.
She asserted her view that Stony Fork is a Receivership Asset and said, in part, *id.*

> Before I can proceed to make a recommendation to the Court on the proposed sale
> of Country Living Mobile Home Park, I again request: (1) a ledger reflecting the
> payments made and (2) a pay off statement reflecting the amount asserted as due
> by Northwest Savings Bank. I would like to prepare a Contract for the buyer,
> which will be subject to SEC comment and Court approval, and which I will share
> with you before filing with the Court.
>
> As you are aware I contacted you promptly upon my negotiation with the
> prospective buyer. . . .
>
> Please let me know if you are in a position to send the requested items, which I
> requested from the bank earlier.

The Bank's lawyer responded at 4:40 p.m. on October 13, 2015. ECF 22-5 at 8. He said,
in part, *id.*

> The Bank has concerns given that you have not stated whether you intend to
> recognize the Bank's lien (including, the Bank's right to the proceeds of the sale
> after customary cost of sale) and service of the loan pending a sale. Given that the
> failure to service the loan results in increased debt and the amount of the gross
> proceeds generated from the Property, I trust that servicing the debt pending the
> sale is a [sic] something you are willing to agree upon.

The Receiver wrote to the Bank's counsel at 5:29 p.m. on October 13, 2015. ECF 22-5 at
7-8. She stated that the buyers hope to purchase the Property, but she had not sent them a
contract because she had "requested a payoff of the bank's principal and interest last week . . . ."
ECF 22-5 at 7. The Receiver also said, *id.*: "I anticipate paying principal and interest in full
when the settlement occurs. You may recall that I made that clear during our conversation last
week. . . ." She added, *id.* "I do not understand the delay in receiving a pay off. I cannot write a
contract and determine the final price without the pay off which should include a per diem for
the interest." *Id.* The Receiver concluded, *id.* at 8:

> Please send the pay off to me today so I can proceed with a contract. I am not in
> the office Thursday – Sunday, so if I do not receive the payoff today, this will

10

wait another week, and I do not expect to pay interest for delays in the bank or you sending me a pay off figure for principal and interest.   Look at the Appointment Order which provides parties who receive notice of the order should cooperate with the Receiver.

On the morning of October 14, 2015, Northwest's counsel wrote to the Receiver advising, in part, that the Bank is "willing to work w/ the Receiver and consent to the sale of the Property based upon the understanding that Northwest's properly perfected lien will be recognized . . . ." ECF 22-5 at 6.   In particular, the Bank's attorney advised that the Bank was owed $269,255.00 in principal; $3,037.21 in interest; $100.24 in late fees; $74.50 in loan fees; $3,812.25 in discounted attorney's fees and expenses; and interest at a rate of $52.35138 per diem. *Id.*   The Bank's lawyer also said, *id.* at 7:

> As you are aware, Northwest previously provided you with a payoff statement and no payments have been made by the Receiver.   As such, to suggest that Northwest is delaying the process or increasing costs misses the mark.   In fact, Northwest has proposed a reasonable mechanism to allow you to sell the Property with the consent of Northwest.   Hopefully, providing simple adequate assurances is something you are willing to do.   Northwest reserves all rights.

Counsel for the Bank sent the Receiver a detailed email on October 31, 2015 (ECF 22-5 at 6), again outlining his position and the Bank's demands.   Among other things, counsel complained that the Receiver had caused the Bank "to have a troubled non-performing asset and increased the indebtedness."   ECF 22-5 at 6.   The Bank's lawyer also complained about the Receiver's lack of "basic adequate protections and assurances . . . ." *Id.*

Ms. Hecht got married during the weekend of October 31 and November 1, 2015.   *See* ECF 22-5 at 16.   But, she wrote to the Bank's lawyer on November 2, 2015.   *Id.*   She indicated that she "remain[ed] hopeful the property will be sold quickly," and set forth the efforts she had taken to preserve and maintain the Property.   *Id.*

The attorney for the Bank wrote to the Receiver on November 4, 2015 (ECF 22-5 at 15-16), congratulating her on her wedding, but noting that he had not received a response to his email of October 31, 2015. *Id.* at 15. He said, in part, *id.* (emphasis in original):

> To date, the Receiver has stated that she *anticipates* paying the principal and interest of the loan when settlement occurs (October 13th @ 5:29 pm) and *hopes* to work with the Bank to pay off the principal and interest (October 13th @ 6:15 pm). Clearly, this does not give the Bank much comfort.
>
> Please keep in mind that we have differing views on the authority granted to you under the receivership order. It is the Bank's position that real property owned by Stony Fork LLC is not property of the estate . . . .

The attorney then set forth a list of seven demands for the Receiver to meet in order to obtain the Bank's consent to the sale of the Property. *Id.* These included the following, *id.* (emphasis in original):

> 1. The Receiver resumes monthly payments starting with December's monthly payment and cures the post-petition arrearage. *{It is my understanding that there are sufficient funds to do so}*.
> 2. The Receiver acknowledges that Northwest hold a valid 1st position lien on the real property and will pay the Bank's indebtedness according to the terms of the loan documents (the "Debt") from the net proceeds of the sale of the real property after customary fees and expenses. *{The property and judgment report evidencing the same and the loan documents were provided to the Receiver}*
> 3. The Receiver maintains and preserves the real property (including, insuring the property and paying taxes). . . .
>                                          ***
> 5. The Receiver furnishes documents in its possession as it relates to the real property to extent that the Bank is entitled to the same under the loan documents.

On November 6, 2015, the Receiver agreed to resume making monthly Loan payments as of December 2015, if the sale of the Property was not completed. ECF 22-5 at 14. She explained that she anticipated the sale of the Property in December 2015. *Id.* The Receiver also said, *id.*: "I have acknowledged the bank's first position." And, she stated, *id.* "I am taking all steps

necessary to make sure there is no dissipation of asset.  As previously stated, the property is

insured, there is [a] property manager, and taxes are paid."[4]

The Bank's lawyer responded on November 11, 2015.  ECF 22-5 at 13-14.  He included a

list of concerns and demands.  He said, *id.* (emphasis in original):

1.  The Receiver resumes monthly payments starting with December's monthly payment and cures the post-petition arrearage.  It is my understanding that the Receiver is willing [to] start making monthly payments in December on a going forward basis.  However, you have not addressed curing the arrearage associated with the failure to make monthly payments for August, September, October and November (assuming the loan had not been accelerated). Payments are due on the 30th and these all such payments post-date the Receiver's appointment.  There is currently 17k+/- in the Stony Fork operating account.  Thus, there are proceeds from which to service the debt and the Receiver has chosen not to do.  Please clarify.

2.  The Receiver acknowledges that Northwest holds a valid 1st position lien on the real property and will pay the Bank's indebtedness according to the terms of the loan documents (the "Debt") from the net proceeds of the sale of the real property after customary fees and expenses.  The Receiver acknowledged the 1st lien position but has *not* acknowledged repayment of the Northwest's indebtedness from the net proceeds after customary expenses.  As the Receiver is aware, the debt includes more than P+I.  The additional fees and expenses continue to accrue given the lack of payment and lack of clarity from the Receiver.  Please clarify.

3.  The Receiver maintains and preserves the real property (including, insuring the property and paying taxes).  I believe the Receiver has verbally committed to the same. Please confirm.

4.  If the Receiver determines that the net proceeds from sale of the real property would be insufficient to satisfy the Debt, the Receiver shall abandon and interest in the real property so that the Bank can liquidate the same unless the Bank agrees otherwise. No response from the Receiver.

5.  The Receiver furnishes documents in its possession as it relates to the real property to extent that the Bank is entitled to the same under the loan documents. No response from the Receiver.

6. Provided the Receiver complies therewith, the Bank will forbear from enforcing its rights and release its lien on the real property upon payment of the Debt. Northwest is committed to entering into a mutually beneficial relationship provided the Receiver is willing to commit in writing.

---

[4] Apparently, Ms. Hecht wrote the email while she was overseas.  *See* ECF 22-5 at 18. She noted that her "internet connectivity [was] limited" and asked counsel to "excuse [her] brevity." ECF 22-5 at 14.

7.   If the Receiver fails to comply with the terms, the Bank shall be entitled to enforce i[t]s rights in and to the real property and the proceeds generated therefrom without further order of the Court.  No response from the Receiver.

At 11:06 a.m. on November 17, 2015, the Bank's attorney wrote to counsel for the Receiver.  ECF 22-5 at 13.  He said, in part, *id.*:

[I]t is Northwest's position that the Receiver [is] taking actions outside the scope of authority granted under the Receivership Order by exercising control over property of Stony Fork LLC.  Even if the property of Stony Fork LLC constitutes a Receivership Asset, it is Northwest's position that the Receiver is not complying with her obligations under the Receivership Order by failing to comply with certain contractual obligations by and between Stony Fork LLC and Northwest.

Furthermore, given the lack of an adequate response to basic inquires, I will be advising Northwest to protect its interests.

Ms. Hecht responded that evening, item by item to an earlier email from the Bank's lawyer, sent on November 11, 2015 (ECF 22-5 at 13).  ECF 22-5 at 18-20.  Notably, Hecht said, in part, ECF 22-5 at 19:  "I would not recommend payment of your legal fees from the net proceeds for the reasons I previously explained.  I have agreed to pay the principal, interest, late and loan [sic] fees. . . ."  ECF 22-5 at 19.

The following portion of the email is also pertinent.  *Id.*  (For clarity, the Receiver's response to the Bank's counsel is in italics).  *Id.*

6.   Provided the Receiver complies therewith, the Bank will forebear from enforcing its rights and release its lien on the real property upon payment of the Debt.   Northwest is committed to entering into a mutually beneficial relationship provided the Receiver is willing to commit in writing.

*11-17-15:  This is my desire to which I have communicated to you.  It seems the only difference in our position is that you seek:  (a) payment of your legal fees for approximately $4,000 and (b) immediate payment of September, October and November mortgage payments (which three payments will be paid upon anticipated sale.[)]  I understand from the likely buyers' counsel, you spoke with him over the last couple of weeks.  I presume you are up to date with that status and that the buyers do not need financing to consummate this deal.  Today, I learned of the buyers' represented counsel in this matter.*

The Bank's lawyer and the Receiver continued to exchange emails through late November 2015. On November 22, 2015, the Bank's lawyer wrote, ECF 22-5 at 18: "Unfortunately, the Receiver's actions and inactions are causing Northwest Savings Bank (the secured lender with a first position properly perfected lien on the real property owned by Stony Fork LLC) to incur unnecessary fees and expenses."

Counsel for the Receiver wrote to the Bank's counsel on November 23, 2015, stating, in part, ECF 22-5 at 21:

> Ms. Hecht has received a contract for sale of the Stony Fork property which she intends to accept, subject to court approval. My understanding is that the contract, which will be the subject of a second motion to be filed within the next several days[,] is for an amount sufficient to satisfy in full the bank's lien. Pending approval and closing on the sale, Ms. Hecht also intends to make monthly payments to the bank commencing with the December payment. The receiver is already maintaining the property, and insurance is in place. Due to the expenses of that maintenance, both expected and unexpected, it is imprudent for the receiver to pay arrearages to the bank prior to the property's sale. Given the existence of the contract and the equity cushion it provides, I trust this will be acceptable.

And, on November 23, 2015, the Bank's counsel responded to the Receiver's lawyer stating, in part, ECF 22-5 at 21:

> The Bank has incurred unnecessary fees and expenses because the Receiver, among other things, (i) did not make and would not commit to making post-petition payments and (ii) consistently failed to address the Bank's concerns including, failing [to] state that the net proceeds from the sale would be paid to the Bank on account of its 1st position lien. A substantial portion of the fees and expenses incurred could have been avoided if the Receiver was transparent.

## II.   Contentions

Northwest complains that the Receiver failed to make four Loan payments, from August through November 2015. At the non-default rate, Stony Fork owed $2,004.85 per month. According to Northwest, however, because of Stony Fork's default, it is entitled to interest at the default rate, in the total monthly sum of $2,435.71, for a total owed of $9,742.84. If my

calculations are accurate, Northwest complains that, apart from principal and interest, Northwest is entitled to an additional sum of approximately $1,840 in default interest. In addition, Northwest asserts that it is entitled to recover the legal fees it incurred in connection with this dispute. Through mid October, they amounted to about $4,000, as discounted.

Notably, Northwest expressly asserts that it "does not oppose the Receiver's efforts to exercise Colonial Tidewater's partial membership interest in Stony Fork to sell the property to a third party buyer." ECF 22 at 2, ¶ 4; *see also id.* at 9, ¶ 31 (stating that the Bank "is not opposed to the Receiver exercising the membership and management rights of Stony Fork – in accordance with the Receivership Order and applicable law – to sell the Property"). Indeed, the Bank asserts that it has not taken any action to foreclose on the Property, notwithstanding that the Receiver did not make payments due on the Loan. *Id.* ¶ 32. Nevertheless, Northwest claims that, "if the Receiver wants Northwest to release its lien, than [sic] the Receiver has to pay Northwest what is due and owing to it under the terms and conditions of its commercial loan with Stony Fork." ECF 22 at 2, ¶ 5.

According to Northwest, the Receiver's motions "seek to impermissibly interfere with Northwest's contractual and property rights" under its Loan, "by allowing the Receiver to sell certain income producing property of Stony Fork which is collateral for the loan, but not pay Northwest the full amounts of the indebtedness secured by the property." ECF 22 at 1, ¶ 1. The Bank posits that the Receiver's appointment "does not give the Receiver the right to impair Northwest's contractual and property rights arising from the loan to Stony Fork, which is a separate and distinct legal entity." ECF 22 at 2, ¶ 2.

As noted, the Bank claims entitlement to legal fees that the Bank incurred to assert its rights, as well as default interest on the Loan. Northwest maintains that the default interest and

attorneys' fees "were caused by the Receiver's actions (and inaction) in (i) failing to service the loan from excess cash flows from the income producing property – which also constitute Northwest's collateral – and (ii) refusing to recognize Northwest's legal rights, thereby causing the need to engage counsel to protect and preserve said rights – including the filing of this opposition." ECF 22 at 2, ¶ 3. In particular, the Bank asserts that the Receiver could have made the payments from funds derived from rents, which is "*Northwest's collateral*" (emphasis in ECF 22), and yet the "Receiver refused to make any [Loan] payments to Northwest" (ECF 22, ¶ 28), even though there was "clearly available cash to keep the Loan current . . . ." ECF 22, ¶ 29.

Moreover, Northwest insists that the Receiver "refused to provide Northwest with adequate assurances that its debt would be paid in full upon completion of the sale of the Property." *Id.* ¶ 30. Thus, Northwest argues that its conduct was prompted by its need for "adequate and firm assurances from the Receiver that its rights would not be adversely affected by the Receiver's actions" (ECF 22 at 10, ¶ 33), and it insists that it had to incur attorneys' fees and expenses "to protect its interest and enforce its rights under the Loan Documents . . . ." *Id.* ¶ 35.

Specifically, Northwest demands payment of reasonable attorneys' fees incurred to enforce its contractual rights (ECF 22, ¶ 39), because the Receiver forced "a contested matter to be litigated . . . ." ECF 22 at 10 n.6. In this regard, Northwest maintains that the Receiver never expressly stated she would pay Northwest from the proceeds of the sale or commit to resuming monthly payments (ECF 22 at 6, ¶ 15), and the Receiver delayed providing "simple and straight forward assurances regarding its collateral and payment of its indebtedness (including, whether the Receiver would recognize Northwest's lien) . . . ." ECF 22 at 6, ¶ 17. In its view, the "Receiver used confusing and roundabout statements . . . ." *Id.* ¶ 15. Therefore, because the

Loan was not timely paid by the Receiver, the Bank insists that it is entitled to recover default interest. *Id.* ¶ 40.

The Bank asks the Court to do the following: "Grant[] the Motion of Receiver to Authorize Sale of Country Living Mobil[e] Home Park and Motion of Receiver to Approve Sale of Country Living Mobile Home Park to Cathy and Tim Driebelbies, subject to Northwest's rights under the Loan Documents and applicable law to be paid the full amount of the indebtedness owed by Stony Fork, including default interest and legal fees and expenses[.]" ECF 22 at 12, ¶ A. And, it asks the Court not to release Northwest's liens to the Property and rent until Northwest is paid in full. *Id.* ¶ B.

The Receiver counters that the legal fees incurred by the Bank were unnecessary. ECF 25 at 3. In her view, "the bank chose to incur [the fees and] should not be awarded [the legal fees] as a secured debt of Stony Fork because they were not necessary and were unreasonable." ECF 25 at 3. Characterizing the conduct of the Bank as "aggressive" (ECF 25 at 3), the Receiver insists that Northwest violated various provisions of ¶ 26 of the Appointment Order. The Receiver also asserts that she was in frequent communication with the Bank from the outset, and provided assurances to the Bank that it would be paid the sums due and owing. Therefore, she asserts that there was no basis for the Bank to incur legal fees. ECF 25 at 4-5. In the Receiver's view, payment of the fees "would be a waste of receivership assets which Receiver has diligently worked to preserve, maintain, and protect." *Id.* at 5.

### III. Discussion

The Bank maintains that the Property is not an asset of the Receivership Estate. ECF 22 at 7, ¶ 22. And, the Bank insists that Colonial "does not have title in or to the assets of Stony Fork (including, the Property), nor do they constitute part of the Receivership Estate." ECF 22 at

7, ¶ 20.  It acknowledges, however, that Colonial has a "partial membership interest in Stony Fork." *Id.*

To be sure, "a Limited Liability Company (LLC) under Maryland law . . . is treated as a separate legal entity for purposes of liability and property ownership." *Kreisler v. Goldberg*, 478 F.3d 209, 213 (4th Cir. 2007).  Yet, the Bank has not provided any persuasive authority to indicate that the Receiver has acted improperly in pursuing a sale of the Property.

Hill relinquished management control of Stony Fork and, as Ms. Hecht puts it, she "stepped into the void resulting from the removal of Sherman Hill and took steps to secure, maintain, and market the operating trailer park which constitutes Stony Fork's primary asset . . . ." ECF 25 at 2.  When the Receiver took control of Stony Fork, she also took control of its bank account at Northwest, which held approximately $6,000 at the time the Receiver was appointed.  ECF 22 at 8, ¶ 28; ECF 20 at 4, ¶ 9.  The Bank insists the funds in the Bank should have been used to pay the monthly mortgage.  But, the Receiver explains that she determined to retain the funds as protection for unforeseen expenses, such as matters to be addressed in order to sell the Property, and because she had no other access to funds in the event any were needed. According to the Receiver, "Northwest desired that the Receiver maintain the Property." ECF 25 at 3.  And, she asked the Bank to forbear on monthly mortgage payments, in order to preserve Stony Fork's "small cash balance," with assurances to the Bank of payment at closing.  ECF 25 at 3.  During the period of time at issue, the Receiver collected additional rents and the account grew to $17,000.  ECF 22 at 8-9, ¶ 28.  *See also* ECF 20, ¶ 9.  As the Receiver puts it, "Northwest knew that it would ultimately be paid." ECF 25 at 3.

The record reflects that, as of early October 2015, the Receiver informed the Bank of her intention to sell the Property.  At that time, two mortgage payments were due, for August and

19

September 2015, in the total amount of approximately $4,009. ECF 25 at 2. Ms. Hecht also made clear to the Bank that, at the time of the sale of the Property, the Bank would be paid the principal and interest due and owing on the Loan. *See, e.g.*, ECF 22-5 at 3.

The Note provides for payment of attorneys' fees when "the Borrower does not pay." ECF 22-1 at 3. Although the Receiver did not timely pay several mortgage payments, Northwest was well aware that the Receiver intended to pay principal and interest upon completion of the sale. Yet, as of October 15, 2015, the Bank incurred legal fees of $3,812.25 (discounted by 15%). ECF 22-5 at 7. The Bank's assertion that the fees are warranted because the Receiver's statements were "confusing and roundabout" (ECF 22 at 6, ¶ 15), as well as "evasive" (*id.* ¶ 17), and did not constitute "simple and straight forward assurances," *id.*, is belied by the record. The Receiver repeatedly explained that Northwest would be paid at closing, but the Bank was not satisfied with these assurances.

Even assuming that Northwest has the right to recover legal fees, the legal fees must be reasonable and necessary, under both Maryland law and Pennsylvania law. Northwest has failed to explain the basis for its fee request, nor has it provided the Court with any authority as to the grounds for an award of counsel fees under Pennsylvania or Maryland law.[5]

Pennsylvania has "consistently followed the general, American rule that there can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties or some other established exception." *Merlino v. Delaware County*, 556 Pa. 422, 425, 728 A.2d 949, 951 (1999); *see McMullen v. Kutz*, 603 Pa. 602, 611–12, 985 A.2d 769, 775 (2009); *DeLage Landen Fin. Servs., Inc. v. Rozenstsvit*, 939 A.2d 915,

---

[5] Indeed, the Opposition is filled with accusations but sparse on legal authority. It does not include any legal authority governing the award of fees under Pennsylvania or Maryland law.

923 (Pa. Super. 2007); *Putt v. Yates-American Mach. Co.*, 772 A.2d 217, 226 (Pa. Super. 1998);

*Montgomery Ward & Co., Inc. v. Pacific Indem. Co.*, 557 F.2d 51, 58-59 (3d Cir. 1977).

As to fee requests, courts deciding cases under Pennsylvania law are guided by

Pennsylvania Rule of Civil Procedure 1717.  It states:

> In all cases where the court is authorized under applicable law to fix the amount of counsel fees it shall consider, among other things, the following factors:
>
> (1) the time and effort reasonably expended by the attorney in the litigation;
>
> (2) the quality of the services rendered;
>
> (3) the results achieved and benefits conferred upon the class or upon the public;
>
> (4) the magnitude, complexity and uniqueness of the litigation; and
>
> (5) whether the receipt of a fee was contingent on success.

The Editors' Notes for the Rule state, in part, that "the Rule does empower the court, if

fees are allowable, to regulate the amount of fees and expenses.  The court is not bound by the

amount or percentage of the fee set forth in a contingent fee agreement . . . ."[6]

In Pennsylvania "it is hornbook law that the reasonableness of the fee is a matter for the

sound discretion" of the trial court.  *In re LaRocca's Trust Estate*, 246 A.2d 337, 339 (Pa. 1968).

Pennsylvania law is clear that the trial court has the authority to consider the reasonableness of a

request for attorney's fees.  *McMullen*, 985 A.2d at 777.  As the *McMullen* Court said, *id.* at 776:

"If we were to forbid a reasonableness inquiry by a trial court, there would be no safety valve

---

[6] In *Polselli v. Nationwide Mut. Fire Ins. Co.*, 126 Fed. 3d 524 (3d Cir. 1997), the Third Circuit, interpreting the rule when it was designated as Rule 1716, stated that "the factors considered in Rule 1716 are implicitly taken into account in the lodestar method."  *Id.* at 533 n.12; *see also Krebs v. United Refining Co. of Pa.*, 983 A.2d 776, 790 (Pa. 2006) (recognizing that the lodestar approach applies in fee shifting cases in Pennsylvania); *Jones v. Muir*, 515 A.2d 855, 864 (Pa. 1986) (explaining lodestar approach).

and courts would be required to award attorney fees even when such fees are clearly excessive." *See also Evergreen Cmty. Power LLC v. Riggs Distiller & Co.*, 513 F. App'x 236, 239-40 (3d Cir. 2013) (concluding that District Court's determination that request for attorney's fees was not reasonable comported with Pennsylvania law).

Even if Maryland law applied here, the law is much the same. Like Pennsylvania, Maryland follows the "American Rule," under which "a prevailing party is not awarded attorney's fees 'unless (1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution.'" *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 445, 952 A.2d 275, 281 (2008) (quoting *Thomas v. Gladstone*, 386 Md. 693, 699, 874 A.2d 434, 437 (2005)).

"Contract provisions providing for awards of attorney's fees to the prevailing party in litigation under the contract generally are valid and enforceable in Maryland." *Myers v. Kayhoe*, 391 Md. 188, 207, 892 A.2d 520, 532 (2006). "It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (quoting *Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443, 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

Notably, "Maryland law limits the amount of contractual attorneys['] fees to actual fees incurred, regardless of whether the contract provides for a greater amount." *SunTrust Bank v.*

*Goldman,* 201 Md. App. 390, 398, 29 A.3d 724, 728 (2011). Moreover, "[e]ven in the absence of a contract term limiting recovery to reasonable fees, trial courts are required to read such a term into the contract and examine the prevailing party's fee request for reasonableness." *Myers,* 391 Md. at 207, 892 A.2d at 532; *see also Atl. Contracting & Material Co. v. Ulico Cas. Co.,* 380 Md. 285, 316, 844 A.2d 460, 478 (2004); *SunTrust,* 201 Md. App. at 401, 29 A.3d at 730. Thus, as in Pennsylvania, "courts [in Maryland] must routinely undertake an inquiry into the reasonableness of any proposed fee before settling on an award." *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton,* 416 Md. 325, 333, 7 A.3d 1, 5 (2010). The "reasonableness of attorney's fees is a factual determination within the sound discretion of the court." *Myers,* 391 Md. at 207, 892 A.2d at 532.

The party seeking to recover legal fees has the burden "'to provide the evidence necessary for the fact finder to evaluate the reasonableness of the fees.'" *Ulico,* 380 Md. at 316, 844 A.2d at 478 (citation omitted). Therefore, the party seeking a fee award must provide "'detailed records'" that specify "'the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged.'" *Rauch v. McCall,* 134 Md. App. 624, 639, 761 A.2d 76, 84 (2000) (citation omitted), *cert. denied,* 362 Md. 625, 766 A.2d 148 (2001). "'[W]ithout such records, the reasonableness, vel non, of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence.'" *Id.* at 639, 761 A.2d at 85 (citation omitted). I pause to underscore that Northwest has not provided any records that specify counsel's services, by whom performed, the time expended, or the hourly rate.

As in Pennsylvania, Maryland courts ordinarily utilize the "lodestar" approach when determining attorneys' fees under fee-shifting statutes. *Friolo v. Frankel,* 373 Md. 501, 504–

505, 819 A.2d 354, 356 (2003) ("*Friolo I*").[7]  However, the Maryland Court of Appeals has said that the lodestar approach is "an inappropriate mechanism for calculating fee awards" under contractual fee-shifting provisions in "disputes between private parties over breaches of contract." *Monmouth Meadows*, 416 Md. at 336, 7 A.3d at 7.  This is because a "contractual fee-shifting provision is designed by the parties, not by the legislature. . . . Thus, it usually serves no larger public purpose than the interests of the parties." *Congressional Hotel Corp. v. Mervis Diamond Corp.*, 200 Md. App. 489, 505, 28 A.3d 75, 84 (2011).

Appendix B of the Local Rules of this Court specifies that the rules and guidelines in Appendix B "do not apply to cases in which statutes or contracts authorize fees based on a fixed percentage. . . ." *See* Appendix B, n.1.  In regard to a fee award pursuant to a contract, a court "should use the factors set forth in Rule 1.5 [of the MRPC[8]] as the foundation for analysis of what constitutes a reasonable fee when the court awards fees based on a contract entered by the parties authorizing an award of fees." *Monmouth Meadows,* 416 Md. at 336–37, 7 A.3d at 8.

---

[7] The *Friolo* litigation has spawned numerous opinions of the Maryland appellate courts concerning the award of attorneys' fees. *See Frankel v. Friolo*, 170 Md. App. 441, 907 A.2d 363 (2006) ("*Friolo II*") (holding that, when applying the lodestar approach, a court must provide a "clear explanation of the factors employed"), *aff'd,* 403 Md. 443, 942 A.2d 1242 (2008) ("*Friolo III*") (holding that an award of attorneys' fees under a fee-shifting statute should include "appellate fees . . . incurred in successfully challenging . . . the attorneys' fee awarded"); *Friolo v. Frankel*, 438 Md. 304, 91 A.3d 1156 (2014) ("*Friolo IV*") (reiterating the loadstar approach and concluding that a plaintiff's continued litigation in lieu of settlement does not preclude attorneys' fees and that appellate attorneys' fees are available pursuant to an appeal concerning attorneys' fees).

[8] MRPC 1.5(a) is a standard of professional ethics, generally applicable to all attorney-client relationships, which mandates that an attorney "shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses."

MRPC 1.5(a) enumerates eight non-exclusive "factors to be considered in determining the reasonableness of a fee":[9]

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8) whether the fee is fixed or contingent.

"In order to apply Rule 1.5 to a fee award, a court does not need to evaluate each factor separately." *SunTrust*, 201 Md. App. at 401, 29 A.3d at 730; *see Monmouth Meadows,* 416 Md. at 337 n.11, 7 A.3d at 8 n.11. Indeed, a court need not "make explicit findings with respect to Rule 1.5" at all, or even "mention Rule 1.5 as long as it utilizes the rule as its guiding principle in determining reasonableness." *Monmouth Meadows*, 416 Md. at 340 n.13, 7 A.3d at 10 n.13.

---

[9] Cases decided under the lodestar approach can "provide helpful guidance" in contractual fee-shifting cases, *Congressional Hotel*, 200 Md. App. at 505, 28 A.3d at 85, because "there is likely to be some overlap between the Rule 1.5 factors and the mitigating factors typically considered in a lodestar analysis." *Monmouth Meadows*, 416 Md. at 337, 7 A.3d at 8. A list of factors similar to those in MRPC 1.5 was enunciated, for use in a lodestar analysis, in the seminal case of *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). The so-called "*Johnson* factors" have been adopted for use in lodestar cases by the Fourth Circuit, *see Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 n.28 (4th Cir. 1978), and in Maryland. *See Friolo I,* 373 Md. at 522 n.2, 819 A. 2d at 366 n.2.

Moreover, when conducting an MRPC 1.5 analysis, a court "should consider the amount of the fee award in relation to the principal amount in litigation, and this may result in a downward adjustment. Although fee awards may approach or even exceed the amount at issue, the relative size of the award is something to be evaluated." *Id.* at 337, 7 A.3d at 8. And, a "trial court also may consider, in its discretion, any other factor reasonably related to a fair award of attorneys' fees." *Id.* at 337–38, 7 A.3d at 8; *see also* Pa. R. Civ. P. 1717.

As noted, Northwest has not submitted any information to the Court as to the particulars of its fee request. The record is devoid of any information as to services performed, the time expended thereon, the experience of the lawyer, and the hourly rate. *Rauch*, 134 Md. App. at 639, 761 A.2d at 84. Because no documentation has been provided by Northwest, I cannot determine how, why, or when the legal fees were incurred. Simply put, the Court cannot write a proverbial blank check.

What is evident, however, is that, insofar as Northwest is concerned, this matter was not complicated. The sum at stake concerning default interest was de minimus. And, the Bank was repeatedly assured, in plain English, that it would be paid its principal and interest at closing. The Receiver also agreed to pay late fees. Yet, the Bank was unwilling to accept the Receiver's assurances, persisted in revisiting the same concerns, and injected demands that were disproportionate to the issue of whether the Bank was adequately protected and whether it would be paid off pursuant to the Loan. *Cf. Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 399 (1999) ("Baseless filing puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay.").

Moreover, the Bank's attorney was aware that Ms. Hecht is an officer of the court, but is not an attorney, and that she was largely handling the sale without counsel, unless counsel

became necessary.    Indeed, the Receiver's counsel was brought into the case only after challenges arose in regard to the proposed sale.  ECF 22-5 at 21–22.

And, the Bank's approach did not merely impose a burden on the Receiver, who was attempting to fulfill her duties under the Appointment Order.    The Court, too, expended considerable effort to prioritize this case, at the expense of others, so as not to delay the pending sale. In doing so, the Court devoted considerable time to resolving a matter that was largely undisputed.

As I see it, Northwest over-complicated the matter and created "a mountain out of a . . . mole hill."    *Hardin v. Belmont Textile Machinery Co.*, 2010 WL 2293406, at * 4 (W.D.N.C. June 7, 2010); *see also Kovacs v. United States*, 2011 WL 4625637, at *1 (E.D. Wis. Sept. 30, 2011).  To be sure, "[a]ttempting to quantify the appropriate level of 'lawyering' . . . is admittedly something less than an exact science." *Minneapolis Star and Tribune Co. v. United States*, 713 F. Supp. 1308, 1312 (D. Minn. 1989).  But, the Bank's legal fees of about $4000 through mid October are not justifiable.  At least in part, the fees were generated by the Bank's repeated insistence on assurances that had been provided and for the purpose of obtaining the right to fees. *Cf. Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, LPA*, 599 U.S. 573, 600 (2010) (an attorney should not "needlessly increase the cost of litigation").  To borrow from other judges, Northwest engaged in "over-lawyering." *See, e.g., Salazar v. District of Columbia*, 991 F. Supp. 2d 39, 57 (D.D.C. 2014) (Kessler, J.).

I turn to the claim for default interest.  Even if the Property is part of the Receivership Estate, the Bank maintains that the Receiver lacks authority to modify the Bank's contract rights in connection with the Loan.  ECF 22 at 7, ¶ 23.  Therefore, it contends that it is entitled to default interest.  For this proposition, it cites *Modart, Inc. v. Penrose Indus. Corp.*, 293 F. Supp.

1116, 1119-20 (E.D. Pa. 1967), *aff'd*, 404 F.2d 72 (3d Cir. 1968) (per curiam).   In turn, the *Modart* case cited *Meehan v. Connell & Thracite Mining Co.*, 318 Pa. 481, 178 A. 833 (1935).

The Receiver claims that "post-receivership imposition of default rate interest" is not permitted without leave of Court.   ECF 25 at 5.   However, the Receiver has not provided the Court with any case law to support this position, nor does she discuss any substantive basis for her opposition to the request for default rate interest.   And, in her email correspondence, she agreed to pay "principal, interest, late and loan fees" to the Bank.   ECF 22-5 at 19.

In *Modart*, a Conservator was appointed in Pennsylvania, with powers similar to those of a receiver.   293 F. Supp. at 1118.   Petitioner Joscar Company sought the trial court's permission to levy execution on funds possessed by the Conservator, to satisfy a judgment obtained in New York that was not docketed in Pennsylvania until after appointment of the Conservator.   *Id.* at 1119.   The court applied general principles of receivership law, *id.*, and recognized that "all valid, pre-existing liens on the property continue despite the receivership . . . ."   *Id.*   Moreover, the court said:   "A pre-existing contractual remedy between creditor and debtor would bind the receiver and, through the constitutional protection of contract, would control the court's exercise of discretion . . . ."   *Id.*

However, the petitioner had "no such contractual remedy," nor did it have a secured claim.   *Id.* at 1120.   Therefore, the court rejected Joscar's petition because its judgment did not constitute a valid lien.   *Id.* at 1120.   In this regard, the court observed that no judgment was entered in Pennsylvania until a month after the appointment of the Conservator.   *Id.*   The Third Circuit affirmed.   Nonetheless, the case supports the view that the Receiver cannot alter the terms of a non-executory contract.   *See also Wigton v. Climax Cold Co.*, 113 A. 425, 427 (Pa. 1921) ("A receiver who takes charge of property is bound by the contract existing when he takes

28

possession."); 16 FLETCHER CYC. CORP. § 7785 (2015 Revised Vol.) ("The general rule is that the receiver of a corporation takes its property and assets subject to all existing legal and equitable liens or claims . . . whether arising by contract or by operation of law, because the receiver merely stands in the place of the company over whose property he or she has been appointed receiver.") (footnotes omitted); 75 C.J.S. *Receivers* § 167, Research References (2002) ("A valid contract subsisting at the time of the appointment of a receiver, which fixes obligations and determines rights of the respective parties, cannot be alleviated or impaired by the court or by any act on the part of the receiver") (footnotes omitted); 15 STANDARD PENNSYLVANIA PRACTICE 2d § 84:109 ("A receiver acquires receivership properties subject to all valid liens and encumbrances . . . .").

The foregoing persuades me that the Bank is entitled to default interest, to be paid at the time of settlement, upon proper documentation of the default interest due and owing for the period August 2015 until closing on the Contract.

An Order follows.

Date:  December 22, 2015

Ellen L. Hollander
United States District Judge